**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY and SELF, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 9, 2018**

# In the Court of Appeals of Georgia

A17A2035. SEDEHI v. CHAMBERLIN.

DILLARD, Chief Judge.

Arya Sedehi appeals the trial court's final judgment in his divorce action against his former wife, Amanda Chamberlin, challenging the trial court's lump-sum award of alimony to Chamberlin. Specifically, Sedehi argues that the trial court erred by awarding alimony, over his objection, because Chamberlin never asserted a claim for alimony in any pleading, sought leave of the court to amend her pleadings, or presented any evidence to support an alimony award. Alternatively, Sedehi argues that, even if the trial court was authorized to award alimony, the amount awarded to Chamberlin was excessive. For the reasons set forth *infra*, we reverse the final divorce judgment, in part, as to the alimony award, and affirm the remainder of the judgment, which is not challenged by either party on appeal.

Viewing the evidence in the light most favorable to the trial court's rulings,[1] the record shows that Sedehi and Chamberlin met in college and dated on and off for at least eight years prior to their 2015 wedding. After graduating college, during a time when the couple was not romantically involved, Chamberlin moved to Washington D.C. for a job opportunity, where she bought a house, and Sedehi remained in Atlanta for graduate school. But the couple stayed in touch, and in 2012, they began a long-distance dating relationship. Eventually, Chamberlin moved back to Atlanta, and approximately one year later, in June 2014, Sedehi and Chamberlin became engaged to be married. After the engagement, Chamberlin moved in to a condominium with Sedehi that he owned and had lived in for approximately ten years.[2] Almost one year later, in May 2015, Chamberlin received a Facebook message

---

[1] *See Gibson v. Gibson*, 301 Ga. 622, 624 (801 SE2d 40) (2017) ("In reviewing a bench trial, we view the evidence in the light most favorable to the trial court's rulings, defer to the trial court's credibility judgments, and will not set aside the trial court's factual findings unless they are clearly erroneous.").

[2] According to Sedehi, in 2005, the condominium's original owner, his cousin, transferred the property to him before she got married "as part of the pre-marital counseling." Sedehi testified that the condominium was purchased by his family to help various family members build credit, and it was transferred to him via a warranty deed at a time when he was a college student who did not have enough money to purchase real estate. Sedehi did not pay rent when he alone resided in the condominium, but when he lived there with Chamberlin, he paid utilities out of their joint account. In early August 2015, one month prior to the wedding, Sedehi

from a man who alleged that Sedehi was having a sexual relationship with his wife. Sedehi denied the allegations and told Chamberlin that the message might be part of an Internet scam.[3]

On September 5, 2015, Sedehi and Chamberlin were married in Cape Cod, Massachusetts, where Chamberlin's family owns a vacation home. But only 22 days after the wedding (and approximately one week after the couple returned home from their honeymoon), the parties separated. The separation resulted from a significant fight the newlyweds had following a music festival, at which Chamberlin observed Sedehi taking illegal drugs. Although Sedehi's family owned the condominium,

---

transferred the property to his mother because it was "not actually [his.]" Sedehi testified that the condominium was only transferred to him to help build credit, and he transferred it to his mother prior to the wedding as part of "pre-marital planning." Sedehi further testified that, one month prior to the wedding, he also transferred a lake house, which was held in the name of a company he owned, to his mother as co-trustee of a family trust. Sedehi admitted that he did not receive anything of value for the transfer, but he contended that it was not his property and that he was merely giving it back to his family's trust. Although these property transfers are referenced extensively throughout the record and at trial, they are irrelevant to the resolution of this appeal. We note this evidence solely to provide context for the fraud claims raised by Chamberlin, which are detailed *infra*. The trial court denied Chamberlin's fraud claims, and she has not appealed that judgment.

[3] Some time after the wedding, Sedehi admitted to having one sexual encounter with the man's wife a few months before he married Chamberlin. Again, evidence of Sedehi's infidelity during the engagement is relevant only to provide context for Chamberlin's fraud claims.

Chamberlin continued living there rent-free after the separation for approximately the next eight months, while Sedehi moved in with his parents. In November 2015, the parties attended a marriage-counseling session at which Sedehi told Chamberlin that he wanted a divorce. Chamberlin wanted to "work on the marriage[,]" but later testified that, at that time, she did not know the extent of Sedehi's drug use or that he "actually had physical relations with [another woman]. . . ." According to Chamberlin, she "would never have gone through a marriage ceremony . . . if [she] had known that [Sedehi] was cheating on [her], that he was using drugs, and that he was lying to [her]."

Ultimately, on December 4, 2015, Sedehi filed a petition for divorce against Chamberlin, alleging that their marriage was irretrievably broken with no prospects for reconciliation. In his prayer for relief, Sedehi requested that he be awarded all real personal property that he acquired prior to the marriage, reasonable attorney fees, a total divorce from Chamberlin, and any other relief that the court deemed proper. The court then issued a standing order, which, *inter alia*, instructed both parties to file a domestic-relations financial affidavit within 30 days, but only Sedehi filed such an affidavit. Chamberlin filed an answer to the divorce petition, contesting the divorce,

4

seeking an annulment, and asserting counterclaims for fraudulent inducement to marry and fraudulent conveyance.

In her answer, Chamberlin admitted many of the divorce petition's factual allegations regarding the timing of the parties' wedding ceremony and separation, but she asserted that Sedehi's claim for a divorce was barred due to fraud. Specifically, in her first counterclaim, Chamberlin asserted a claim of "fraudulent inducement to marry seeking an annulment[,]" alleging that Sedehi falsely promised her that he had stopped using illegal drugs, he would not use such drugs during the marriage, he had been faithful to her during their engagement, and he would remain faithful to her during the marriage. She further claimed that she reasonably relied on these promises when she agreed to marry him. According to Chamberlin, Sedehi lied to her in order to fraudulently induce her to marry him, and as a result, she sustained financial and mental-health damages. As to this counterclaim, she contended that she was entitled to no less than $400,000 in actual damages, as well as punitive damages of at least $1,000,000 and attorney fees. In her second counterclaim, Chamberlin asserted a claim of fraudulent conveyance, alleging that just prior to the wedding, Sedehi conspired with his mother to transfer the condominium to her for the purpose of depriving Chamberlin of any meaningful opportunity to recover damages for her

fraudulent-inducement claim. As to this claim, Chamberlin sought an amount of actual damages to be determined at trial, as well as at least $1,000,000 in punitive damages.

Sedehi filed a response, asserting several affirmative defenses and denying the allegations of both counterclaims. He also filed a first amended complaint, adding physical and mental cruelty as grounds for the divorce. In support, Sedehi provided extensive factual allegations regarding the tumultuous nature of the parties' dating relationship prior to the marriage, as well as his version of the events leading up to the marriage ceremony and the circumstances of the parties' separation shortly thereafter.[4]

Discovery ensued, and eventually, the case proceeded to a two-day bench trial. Following trial, the court issued an order granting the parties a divorce on the grounds that the marriage was irretrievably broken, denying Chamberlin's request for an annulment, denying her fraud claims, providing for the equitable division of property,

_____

[4] In his amended complaint, based on the detailed background information he provided, Sedehi asserted numerous claims against Chamberlin. But prior to trial, Sedehi voluntarily dismissed those claims, and pursued only his original claim for a divorce.

and awarding Chamberlin a lump-sum alimony award of $105,000.[5] As a basis for the alimony award, the trial court first found that Chamberlin had "incurred certain expenses and costs and [had] become accustomed to a certain lifestyle." Furthermore, the court found that Chamberlin required the award for "a rehabilitative period to get back on her feet." The court ordered Sedehi to make two lump-sum payments of $52,500, with the first payment due approximately three months after trial and the second one due four months later. Thereafter, we granted Sedehi's application for a discretionary appeal.

In the appellate review of a bench trial, we will "not set aside the trial court's factual findings unless they are clearly erroneous, and this Court properly gives due deference to the opportunity of the trial court to judge the credibility of the witnesses."[6] But when a question of law is at issue, we review the trial court's

---

[5] Although it is unclear on what basis the trial court determined the amount of the alimony award, it is worth noting that, at trial, Chamberlin testified that she spent approximately $100,000 on the Cape Cod wedding, and that she had to sell her house in Washington D.C. to pay for it.

[6] *Patel v. Patel*, 285 Ga. 391, 391 (1) (a) (677 SE2d 114) (2009) (punctuation omitted); *see supra* note 1.

decision *de novo.*[7] With these guiding principles in mind, we turn now to Sedehi's specific claims.

1. Sedehi first argues that the trial court erred in awarding alimony to Chamberlin when she never asserted a claim for alimony in her pleadings, she never moved to amend her pleadings to include such a claim, he had no notice that alimony would be an issue at trial, and he objected to litigating that issue when it was raised for the first time at trial. We agree.

As explained by the Supreme Court of Georgia, "[t]he constitutionally-guaranteed right to due process of law is, at its core, the right of notice and the opportunity to be heard."[8] Furthermore,

> [n]either the federal nor the state constitution's due process right guarantees a particular form or method of procedure, but is satisfied if a party has reasonable notice and opportunity to be heard, and to present

---

[7] *See, e.g.*, *Colbert v. Colbert*, 321 Ga. App. 841, 841 (1) (743 SE2d 505) (2013); *see also Brooks-Powers v. Metro. Atlanta Rapid Transit Auth.*, 260 Ga. App. 390, 390 n.1 (579 SE2d 802) (2003) ("We owe no deference to a trial court's ruling on questions of law and review such issues de novo.").

[8] *CML-GA Smyrna, LLC v. Atlanta Real Estate Investments, LLC*, 294 Ga. 787, 788 (1) (756 SE2d 504) (2014) (punctuation omitted); *accord Cobb Cty. Sch. Dist. v. Barker,* 271 Ga. 35, 37 (2) (518 SE2d 126) (1999); *Lewis v. City of Savannah*, 336 Ga. App. 126, 133 (2) (b) (784 SE2d 1) (2016).

8

its claim or defense, due regard being had to the nature of the proceeding and the character of the rights which may be affected by it.[9]

Here, as detailed *supra*, Chamberlin's answer to the divorce petition sought an annulment, as well as actual and punitive *damages* resulting from fraud. And Sedehi correctly notes that Chamberlin never amended her answer, either prior to trial or by motion during trial, to add any alternative forms of relief in the event that the court granted a divorce, rather than an annulment. In fact, throughout discovery and during trial, Chamberlin affirmatively indicated that she sought *only damages* for fraud, regardless of whether the court rejected her claim for an annulment. For example, during Sedehi's pre-trial deposition, his counsel objected to certain questions regarding Sedehi's finances and income, stating that those matters have "nothing . . . to do with this case." Sedehi's counsel further contended that such questions were wasting everyone's time and were asked only to harass his client. Chamberlin's counsel responded that the financial issues were relevant because "[t]his is a *fraudulent conveyance case*[,]"[10] and thus, he should be able to question Sedehi

---

[9] *CML-GA Smyrna, LLC*, 294 Ga. at 788 (1) (punctuation omitted); *accord Barker,* 271 Ga. at 37 (2); *Lewis*, 336 Ga. App. at 133 (2) (b).

[10] (Emphasis supplied).

9

regarding any potential sources of income. Additionally, during her deposition, Chamberlin reiterated that she sought an annulment, rather than a divorce, due to Sedehi's dishonesty.

Also during discovery, Sedehi filed a motion in which he argued that some of Chamberlin's discovery requests were unrelated to the divorce action. In defending her right to the requested discovery, Chamberlin stated the following: "This cannot be emphasized enough, *the Plaintiff[ ] [is] being countersued for fraud.* . . . Ms. Chamberlin has not made a demand for equitable division [of property] because no such relief is permitted in an annulment action."[11] Then, just prior to trial, the parties completed a "trial questionnaire" in which they were both asked, *inter alia*, to briefly summarize the issues to be tried in the case. Sedehi indicated that the only issue was a "22[-]day marriage with no marital property to be equitably divided." Although Chamberlin's response was more detailed, she made no mention of alimony or the

---

[11] (Emphasis in original). During trial, Chamberlin also indicated that her marriage to Sedehi was invalid, and as a result, an annulment was warranted. Specifically, she testified, "I agreed that there was a marriage ceremony. I don't believe that there was a wedding, because the vows exchanged were not truthful." Because both equitable division of property and alimony are not "permitted in an annulment action[,]" Chamberlin gave Sedehi no reason to believe that she was seeking any relief available only in a divorce proceeding.

right to any marital property, but instead, briefly summarized the basis for her fraud claims.

At the outset of trial, during his opening statement, Sedehi's counsel described the case as "nothing more than a young couple getting married and getting divorced," specifically noting that "there [was] not a claim for alimony" and that the only marital property to be divided were the wedding gifts. Then, during his opening statement, Chamberlin's attorney began by reiterating that his client was seeking an annulment based on fraud. In support, he provided extensive detail regarding the evidence he planned to present as to the misconduct by Sedehi that constituted such fraud, and the financial and emotional damage that Chamberlin suffered as a result of this behavior. But at some point, the court interrupted Chamberlin's attorney and asked him, "So what does your client want . . .?" In response, the attorney stated that Chamberlin had suffered emotionally, and he listed numerous specific monetary losses she suffered, such as the substantial amount of money she spent on the wedding. In sum, Chamberlin's attorney asserted that the evidence in this case "demands a finding that an annulment is appropriate, and . . . a monetary finding in an amount that [he] will quantify specifically at the appropriate time . . . ." Her attorney also clarified that,

even if the court denied an annulment, *damages for fraud* would still be available in a divorce.

Notwithstanding that Chamberlin's attorney had still made no mention of alimony whatsoever, the court raised the issue for the first time, stating that if Chamberlin failed to prove she was entitled to an annulment, her "exclusive remedy would be equitable division or alimony, something like that." Chamberlin's counsel did not immediately agree, and instead, he reiterated that, even if the court denied an annulment, she could still recover *damages* for her fraudulent-inducement claim in the divorce. Nevertheless, the court persisted, again asking, "So let's say the court—if there is no annulment, do you get [recovery] . . . through some type of alimony, [or] equitable division?" Chamberlin's attorney, still not referencing alimony specifically, responded that generally, "being a court of equity . . . I think that this court has the authority to fashion an appropriate remedy to right the wrongs."

Then, finally addressing the issue of alimony for the first time in this entire litigation, Chamberlin's counsel argued as follows:

> So, whether it is in the form of alimony, lump sum alimony for instance, it could be an approach. Whether it is an equitable division of property, but under a lump sum alimony context, the court could reach into separate property in order to affect that, and so it doesn't necessarily

12

need to be periodic alimony. But under lump sum alimony, for instance, should the court void the [property] transfers under the fraudulent conveyance [claim], then those properties could be available to satisfy a lump sum alimony award. I think the court would be well within its rights to do that.

Thus, although Chamberlin's counsel conceded that the court *could* award lump-sum alimony, he never actually *asked for it*, continuing to maintain that the Court would need to void Sedehi's property transfers as fraudulent such that he had the means to pay either damages or lump-sum alimony.

The trial court and Chamberlin's attorney's discussion of potential remedies continued, but Sedehi's counsel interrupted, reasserting his earlier contention that "[t]here is no claim for alimony anywhere in this case." Sedehi's counsel further argued:

We have not been put on notice, so this issue that now they're going to be asking for lump[-]sum alimony, would [warrant] direction from the court that they're barred from requesting any type of alimony because it wasn't even prayed for or asked for in any of the pleadings in this case.[12]

---

[12] During trial, Sedehi testified to his similar understanding of the case, stating, *inter alia*, that he was not seeking alimony from Chamberlin, and she never sought alimony from him. Chamberlin did not object to this testimony, and she never indicated that she *was* seeking alimony. Indeed, on cross-examination, Sedehi's

13

The court responded by asking, "[b]ut don't [the] pleadings conform to the evidence[?]" And without any response to that question from either party, the first witness was called to testify.

Other than the foregoing discussion with the trial court, neither Chamberlin nor her counsel ever mentioned an award of alimony during trial, or any evidentiary basis for such an award. Indeed, near the conclusion of her trial testimony, Chamberlin was specifically asked what she was asking the court to award her. In relevant part, Chamberlin testified that she wanted an annulment, attorney fees, and approximately $375,000 to compensate her for expenses that she had incurred as a result of Sedehi's dishonesty. Then, Chamberlin was asked on what baiss could a divorce be granted, if the court declined to grant an annulment, and she responded that it would be fraud. In his closing argument, Chamberlin's attorney contended that the evidence supported her fraud claims, but he made no mention of alimony. And in fact, Chamberlin's

_____

counsel asked Chamberlin whether, if the court did not grant an annulment, she was now seeking an alimony award. Chamberlin responded by saying, "I'm asking the court, in the way that the court feels is right, to award me *costs that I have incurred* because your client has lied and deceived [me]." (Emphasis supplied). But as discussed *infra*, alimony is not a reimbursement for expenses resulting from dishonesty, but instead, it is a statutory remedy providing for post-separation spousal support from one spouse to the other granted after consideration of specific statutory factors. *See* OCGA § 19-6-5 (a).

14

attorney reiterated his argument that, even if the court granted a divorce, she should still recover *damages for fraud* because divorce actions provide remedies for fraud. As to those damages, Chamberlin's attorney specifically listed all of the expenses that she incurred as a result of the wedding and separation, concluding that Chamberlin was entitled to $359,080 in damages, not including attorney fees.

In response, Sedehi's counsel argued at length that Chamberlin's fraud claims were meritless and an annulment was not warranted. Then, notwithstanding the fact that neither Chamberlin nor her counsel had ever *requested* alimony or even mentioned it during trial other than in response to questions from the trial court, Sedehi's counsel, presumably in an abundance of caution, reiterated his objection to an award of alimony. Specifically, he noted that Chamberlin sought only an annulment, and she never counterclaimed for alimony, the equitable distribution of property, or a distribution of debt. Nevertheless, at the conclusion of trial, the court denied Chamberlin's request for an annulment, denied both of her fraud claims, and awarded her $105,000 in alimony to be paid in two lump-sum payments.

As evidenced by the foregoing, Chamberlin maintained, from the time she answered the divorce petition until her counsel's closing argument at trial, that an annulment was warranted, the marriage was invalid, and she was entitled to *damages*

15

for fraud. Indeed, despite being given several opportunities to inform the court of the relief being sought, neither Chamberlin nor her counsel ever used the word "alimony" (other than when prompted by the trial court during opening statements).[13] Perhaps most importantly, it was the court, not Chamberlin, that initially raised the issue of alimony as a potential remedy. And while Chamberlin's attorney eventually agreed that the court had the *authority* to grant "equitable relief" in the form of lump-sum alimony,[14] he never *requested* alimony, arguing instead that if a divorce were granted, Chamberlin should still recover damages for fraud. Even during closing arguments, the only mention of alimony was made by *Sedehi*, not Chamberlin, in the context of reiterating his objection that alimony was *not* an issue in the case. In sum, we agree with Sedehi that the trial court's alimony award violated his due-process rights

---

[13] Even in Chamberlin's appellate brief, the vast majority of her statement of the facts relates to her fraud claims, which makes sense because those were the only claims she pursued below. Indeed, she devotes six out of seven pages of that section to reiterating the evidence she believes supports her allegations that Sedehi (1) lied to her about a sexual affair; (2) concealed his drug use from her; and (3) fraudulently conveyed real estate worth $1,100,000 prior to the wedding. But as previously mentioned, the trial court denied Chamberlin's fraud claims, and those claims are *not* at issue in this appeal.

[14] Despite Chamberlin's concession, alimony, which is only authorized in divorce cases, is a *statutory* remedy, not an equitable one. *See* OCGA § 19-6-5 (a). Furthermore, divorce is also governed by statute in Georgia. *See* OCGA 19-5-1, *et seq*.

16

because Chamberlin never expressly asked for such relief, either prior to or during trial, and he had no meaningful opportunity to be heard or to prepare a defense to that claim.[15]

Nevertheless, Chamberlin argues that the alimony award was authorized because Sedehi never objected that he was prejudiced by the admission of evidence at trial, she was not required to amend her pleadings under OCGA § 9-11-15 (b), and

---

[15] *See supra* notes 8-9 & accompanying text; *see also Hedquist v. Hedquist*, 275 Ga. 188, 190 (563 SE2d 854) (2002) (holding that a husband's due-process rights were violated in a divorce proceeding when he did not have notice within a reasonable time before a particular hearing that the trial court would consider and issue a judgment regarding contempt charges against him); *Harris v. Harris*, 258 Ga. 496, 496 (371 SE2d 399) (1988) (reversing a judgment that granted the parties' house to the petitioner for a divorce when the defendant was not put on notice by the complaint that he would have to defend against the wife's claim to the marital home); *In the Interest of B. T. H.*, 326 Ga. App. 531, 534 (1) (757 SE2d 167) (2014) (holding, in a deprivation proceeding, that the parents' due-process rights were violated when they had notice of a "72-hour hearing," but not of a full deprivation hearing, which deprived them of notice of the type of proceeding for which they needed to prepare); *Williams v. Jones*, 291 Ga. App. 395, 398 (662 SE2d 195) (2008) (holding that a party's due-process rights were violated because the opposing party filed nothing to put her on notice that she would have to defend against a particular claim); *Cohen v. Nudelman*, 269 Ga. App. 517, 523 (4) (604 SE2d 580) (2004) (holding, in a child-support case, that, even though the father raised a fraud claim in a pleading, the court violated the mother's due-process rights by awarding damages for fraud following a hearing when the mother had no notice that the fraud claim would be resolved and damages imposed at that particular hearing, which deprived her of any reasonable opportunity to defend against the claim).

the pleadings conformed to the evidence.[16] And while she acknowledges that Sedehi objected to the "alternative remedy" of alimony, she argues that he failed to object to the underlying *evidence* as prejudicial,[17] which relieved her of any obligation to amend her pleadings. These arguments are misplaced because the threshold

[16] Chamberlin also summarily states, without further explanation, that "[t]he evidence supporting [her] damages arising out of [Sedehi's] fraud and deceit was the very same evidence the Court required to fashion an award of alimony[,]" but she fails to identify any such testimony or other evidence. Furthermore, while there could be some overlap in relevant evidence, damages flowing from fraudulent conduct and alimony awards are generally granted on entirely different bases. Specifically, to recover damages for fraud, Chamberlin was required to prove the actual damages that *flowed from Sedehi's alleged fraudulent conduct*, and in contrast, alimony is an allowance out of one party's estate, made for the support of the other party when living separately. *Compare Pampattiwar v. Hinson*, 326 Ga. App. 163, 171 (2) (756 SE2d 246) (2014) ("[I]n order to recover for fraud, a plaintiff must prove that actual damages, not simply nominal damages, flowed from the fraud alleged." (punctuation omitted)), *with Hipps v. Hipps*, 278 Ga. 49, 49 (1) (597 SE2d 359) (2004) ("Alimony is an allowance out of one party's estate, made for the support of the other party when living separately. It is either temporary or permanent." (punctuation omitted)). Also unlike an award of damages for fraud, trial courts must consider certain specific statutory factors in awarding alimony. *See* OCGA § 19-6-5 (a) (1)-(8). Regardless, as explained *infra*, even if some of the evidence presented could be relevant to both claims for relief, the alimony award in this case was still erroneous because the parties did not expressly or impliedly consent to litigating that issue.

[17] Contrary to Chamberlin's claim, both parties made several objections to the relevance of certain evidence throughout trial. And when such objections were made, the trial court and Chamberlin repeatedly confirmed Sedehi's understanding that Chamberlin sought only damages for fraud, as she did not believe the parties were ever married. Significantly, neither party argued and the trial court never expressly ruled that any of the challenged testimony or other evidence was relevant to a claim for alimony.

18

requirement of OCGA § 9-11-15 (b)—that the parties consent, either explicitly or implicitly, to litigating an issue not raised in the pleadings—is not satisfied.

Specifically, OCGA § 9-11-15 (b) provides, in its entirety that

> [w]hen issues not raised by the pleadings are tried *by express or implied consent of the parties*, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of the evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet the evidence.[18]

But Georgia courts have made clear that OCGA § 9-11-15 (b) *only applies* if the new issue was actually litigated with the express or implied consent of both parties. And because Sedehi's attorney unequivocally objected to evidence of this additional claim

---

[18] (Emphasis supplied).

19

and Chamberlin never pursued it, "it cannot be said that the claim was tried with [his] express or implied consent."[19]

Chamberlin's sole argument appears to be that Sedehi implicitly consented to litigating the issue of alimony when he failed to specifically object to the evidence supporting such an award.[20] And she is indeed correct that, under certain circumstances, we have held that a party's failure to make a contemporaneous

[19] *Bland v. Graham*, 249 Ga. App. 856, 857 (549 SE2d 809) (2001); *see Stroud v. Elias*, 247 Ga. 191, 193 (1) (275 SE2d 46) (1981) (reversing a $30,000 award of punitive damages when the pleadings sufficiently alleged a breach-of-contract claim but did not allege sufficient facts to establish a tort, such that punitive damages could be at issue and noting that, absent consent of the parties, an amendment to a pleading must be served on the opposing party); *Inv. Props. Co. v. Watson*, 278 Ga. App. 81, 87 (4) (628 SE2d 155) (2006) (explaining that, when there was nothing in the record to suggest that a party ever consented to trying additional issues or to allowing an amendment to the pleadings, courts must *only determine* whether the additional issues were tried by implication); *Dwyer v. Anand*, 210 Ga. App. 419, 420 (1) (436 SE2d 532) (1993) ("[I]n the absence of an amendment to the complaint, supplemental pleadings, or trial of the [newly-asserted] claims . . . by the express or implied consent of the parties, the trial court was not authorized to enter judgment [on that claim] . . . ."); *Burger King Corp. v. Garrick*, 149 Ga. App. 186, 188 (253 SE2d 852) (1979) ("Since the appellees in this case made a clear objection to the evidence of the additional claims, it cannot be said that these claims were tried with the appellee[s'] express or implied consent. Thus, in the absence of an amendment to the pleadings, the trial court was not authorized to admit this evidence or to enter judgment for any of the claims based on it."). *Cf. Howington v. Howington*, 281 Ga. 242, 244 (2) (637 SE2d 389) (2006) (holding that the trial court was authorized to grant relief not asserted in a pleading by the husband when the wife permitted the issue to be litigated *without objection*).

[20] *But see supra* note 17.

objection to evidence of a new claim *can* constitute implicit consent to an amendment of the pleadings.[21] But such consent does not arise if "the parties do not *squarely recognize* the new issue as an issue in the trial."[22] Moreover, neither the trial court nor Chamberlin has identified any specific evidence that supported the alimony award. Rather, as previously mentioned, Chamberlin contends that the evidence she presented to support her fraud claims also supported the alimony award. But even if that were true, we have held that when a party "does not object to evidence because it is relevant to an issue made by the pleadings, and there is no evidence the party offering such evidence was seeking to amend the pleadings, a non-objecting party can

---

[21] *See, e.g.*, *Sugarloaf Mills Ltd. P'ship of Ga. v. Record Town, Inc.*, 306 Ga. App. 263, 268 (3) (701 SE2d 881) (2010); *Ray v. Nat'l Health Inv'rs, Inc.*, 280 Ga. App. 44, 47-48 (2) (633 SE2d 388) (2006); *see also Holliday v. Jacky Jones Lincoln-Mercury*, 251 Ga. App. 493, 496 (1) (554 SE2d 286) (2001) (holding that, under OCGA § 9-11-15 (b), "[i]mplied consent may be found when a party fails to object to evidence relating to a new issue").

[22] *Holliday*, 251 Ga. App. at 496 (1) (punctuation omitted) (emphasis supplied); *accord Harris v. Eastman Youth Dev. Ctr.*, 315 Ga. App. 643, 646 (1) (727 SE2d 254) (2012); *Watson*, 278 Ga. App. at 87 (4); *Dildine v. Town & Country Truck Sales, Inc.*, 259 Ga. App. 732, 735 (3) (577 SE2d 882) (2003); *see Smith v. Smith*, 235 Ga. 109, 113 (218 SE2d 843) (1975) (holding that a trial court did not err in failing to submit an issue to the jury when it was not raised in a pleading and it was not "squarely recognized as an issue in the trial by the parties" or litigated in the case).

scarcely be held to have given him implied consent to trial of unpled issues."[23] And here, given that Chamberlin never expressly requested alimony as an alternative prayer for relief, and Sedehi repeatedly objected to litigating the issue of alimony, neither party "squarely recognized" alimony as an issue at trial.

We recognize, of course, that whether an issue has been tried by the implied consent of the parties is "a question of fact and a decision on this question is generally considered to be within the sound discretion of the trial court."[24] But here, after an exhaustive review of the record and trial transcripts, we find *no* evidentiary basis to support a finding that Chamberlin ever explicitly requested an alimony award, that the parties litigated that issue, or that anyone other than the trial court "squarely recognized" it as an issue in the case. Under these particular circumstances, OCGA § 9-11-15 (b) does not authorize an amendment to the pleadings, and the trial court erred in awarding alimony to Chamberlin.[25]

[23] *Holliday*, 251 Ga. App. at 496 (1) (punctuation omitted); *accord Home Depot v. Pettigrew*, 298 Ga. App. 501, 504 (1) (680 SE2d 450) (2009); *Dildine*, 259 Ga. App. at 735 (3).

[24] *Smith*, 235 Ga. at 113; *accord Andean Motor Co. v. Mulkey*, 251 Ga. 32, 34 (2) (302 SE2d 550) (1983).

[25] *See supra* notes 15, 19, 22 & accompanying text. Although not decided in the specific context of OCGA § 9-11-15, in *Pray v. Pray*, 223 Ga. 215 (154 SE2d 208) (1967), the Supreme Court of Georgia reversed an alimony award materially

2. Given our holding in Division 1 *supra*, reversing the trial court's alimony award, we need not address Sedehi's alternative argument that the amount of alimony awarded was excessive. But even if the trial court were permitted to award alimony to Chamberlin, the record reveals very little, if any, evidentiary basis to support an award of any amount of alimony to either party. Thus, any amount of alimony awarded to Chamberlin would appear to be excessive.

Nevertheless, given the substantial lump-sum alimony award in this case and the absence of any evidence to support it, it is helpful to review the statutory considerations that must be taken into account in awarding alimony when it is

---

indistinguishable circumstances from this case, except that, in *Pray*, the wife at least requested alimony at trial. *See Pray*, 223 Ga. at 215. In *Pray*, the husband filed a petition for divorce, which the wife opposed, and following a bench trial, the court granted the divorce. *See id.* At the close of evidence, when the court indicated that it was inclined to grant the divorce, the wife responded by requesting alimony for the first time. *See id.* Over the husband's objection that alimony had never been an issue in the case, the court heard testimony regarding the financial conditions of the parties, and ultimately, granted alimony to the wife based on the general prayer for relief in her answer for "such other and further relief as the court deem[ed] proper in the premises." *See id.* The Supreme Court reversed, holding that the wife "waived whatever right she may have had to alimony . . . [because] [i]t is well established that relief cannot be granted for matter not alleged or prayed for." *Id.*; *see also Lambert v. Gilmer*, 228 Ga. 774, 774-76 (187 SE2d 855) (1972) (holding that an award of alimony to the wife in a divorce judgment was void because the husband had no notice that the issue of alimony would be tried and gave no express or implied consent to litigating that issue at trial).

requested. Specifically, OCGA § 19-6-5 (a) provides:

> The finder of fact may grant permanent alimony to either party, either from the corpus of the estate or otherwise. The following shall be considered in determining the amount of alimony, if any, to be awarded:

> (1) The standard of living established during the marriage;

> (2) The duration of the marriage;

> (3) The age and the physical and emotional condition of both parties;

> (4) The financial resources of each party;

> (5) Where applicable, the time necessary for either party to acquire sufficient education or training to enable him to find appropriate employment;

> (6) The contribution of each party to the marriage, including, but not limited to, services rendered in homemaking, child care, education, and career building of the other party;

> (7) The condition of the parties, including the separate estate, earning capacity, and fixed liabilities of the parties; *and*

> (8) Such other relevant factors as the court deems equitable and proper.

While a trial court has wide latitude under OCGA § 19-6-5 (a) (8) to consider factors not specifically enumerated,[26] *none* of the enumerated factors, including those relied

---

[26] *See Sprouse v. Sprouse*, 285 Ga. 468, 470 (678 SE2d 328) (2009) ("[I]n addition to several specific factors, OCGA § 19-6-5 (a) [8] gives the factfinder broad discretion to consider such other relevant factors as the court deems equitable and

upon by the trial court, appear to weigh in favor of an alimony award to Chamberlin (or to Sedehi for that matter). Indeed, it is undisputed that the duration of the marriage was extremely short, and the parties are both relatively young with higher-education degrees and well-paying jobs. Further, at the time of trial, Chamberlin had a second job at a gym as a personal trainer, and each party was able to financially support themselves. Moreover, each party has stable employment that does not require additional education, Chamberlin's salary even exceeded Sedehi's salary, and neither party had contributed any services to the marriage such as childcare or career-building of the other party.

Although the trial court was not required to include factual findings in the divorce decree,[27] the factors that the court *did* reference in the decree appear to have no evidentiary basis. In awarding alimony, the court noted that Chamberlin "had incurred certain expenses and costs[,]" she had "become accustomed to a certain lifestyle[,]" and she "require[d] lump[-]sum alimony for a rehabilitative period to get back on her feet." But, Chamberlin testified that both she and Sedehi incurred

proper." (punctuation omitted)).

[27] *See Smelser v. Smelser*, 280 Ga. 92, 94 (2) (623 SE2d 480) (2005) ("With respect to alimony, there is no statutory requirement that findings be included in the decree.").

25

significant expenses as a result of the wedding, and given that the court found that Sedehi did not fraudulently induce Chamberlin to marry him, it is unclear why only *her* expenses should be taken into consideration. In this respect, Chamberlin testified that Sedehi's family had paid $40,000 in wedding expenses, and they also paid for the couple's two-week long honeymoon to Africa.

Additionally, while Chamberlin collected short-term disability benefits to take some time off of work following the separation due to mental-health issues,[28] there was no evidence that, at the time of the divorce decree, she was unable to work or needed additional time to "get back on her feet." In fact, Chamberlin never even suggested that she *wanted* alimony, much less that she needed it for a rehabilitative period, arguing instead that she wanted to recoup certain expenses and that she was entitled to damages for fraud. Furthermore, although Chamberlin never submitted a domestic-relations financial affidavit, she testified that she currently earned $90,000 per year with the potential for bonuses, she also worked as a gym trainer, and she was able to afford $2,000 rent per month for her new apartment. Sedehi's financial affidavit indicated that he had certain assets and bank accounts that he acquired prior

---

[28] Following the parties' separation, Chamberlin attended therapy and was diagnosed with a single episode of "depressive disorder."

26

to the marriage, but his undisputed testimony was that his then-salary was approximately $70,000 to $72,000 annually, working for a food-manufacturing company.

Finally, while the trial court found that Chamberlin had become accustomed to a certain "lifestyle" during the parties' extremely brief marriage, the only evidence of any financial benefit that Chamberlin received as a result of the marriage was that Sedehi's family allowed her to live in their penthouse condominium rent-free during the engagement and for eight months following the couple's separation. We fail to see how an act of generosity by one spouse's family to the other spouse for a limited period of time constitutes the establishment of a "lifestyle." In sum, even if we agreed with Chamberlin that the court was authorized to award alimony (which we do not), there was no evidence to justify such an award when both Sedehi and Chamberlin were equally self-sufficient, and there was no evidence suggesting that she *needed* any amount of alimony from Sedehi to support herself.[29]

---

[29] *See Sims v. Sims*, 245 Ga. 680, 683 (5) (266 SE2d 493) (1980) ("The strongest governmental purpose for Georgia's alimony laws is the provision of *support for a needy spouse*." (emphasis supplied)); *Worrell v. Worrell*, 242 Ga. 44, 47 (4) (247 SE2d 847) (1978) ("The two controlling factors in determining whether or not an alimony . . . award is excessive are the wife's . . . *need for the award* and the husband's ability to pay it." (punctuation omitted) (emphasis supplied)); *Kosikowski v. Kosikowski*, 240 Ga. 381, 382 (1) (240 SE2d 846) (1977) (noting that "[a] wife's

For all these reasons, we reverse the trial court's final judgment, in part, only as to its lump-sum alimony award to Chamberlin, and affirm the remainder of the judgment.

*Judgment affirmed in part and reversed in part. Self, J., concurs. Ray, J., concurs in judgment only as to Division 2 and fully as to Division 1.*

**\* DIVISION 2 OF THIS OPINION IS PHYSICIAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2 (a).**

---

manner of living, her material resources, and her income, if any, are factors the jury may take into consideration in determining what amount may be *necessary* for the support and maintenance of the wife" (emphasis supplied)); *Thomas v. Thomas*, 233 Ga. 916, 918 (213 SE2d 877) (1975) ("Alimony is never for the purpose of penalizing the wife or the husband for her or his misconduct."). *Cf. Driver v. Driver*, 292 Ga. 800, 803 (3) (741 SE2d 631) (2013) (upholding an award of lump-sum alimony, which was awarded for the purpose of assisting the wife in completing her education and becoming financially independent when there was evidence that the husband could pay the award and the wife *needed it*, given that her "income was comparatively low and her financial status precarious").